UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

SUSAN M. HANSEN,                    )
                                    )
          Plaintiff,                )
                                    )
     v.                             )
                                    )
LIBERTY PARTNERS, LLC and           )
MAINSTREET HOMES, LLC               )
d/b/a MAINSTREET HOMES REALTY,)
                                    )
          Defendants.               )
                                    )
     AND                            )     Case No. 3:04-1099
                                    )     Judge Echols
LIBERTY PARTNERS, LLC,              )
                                    )
          Counter-Plaintiff,        )
                                    )
     v.                             )
                                    )
SUSAN HANSEN,                       )
                                    )
          Counter-Defendant.        )

MEMORANDUM

Pending before the Court is a Motion for Summary Judgment
filed by Defendant Liberty Partners, LLC ("Liberty Partners") which
seeks summary judgment with respect to all of Plaintiff Susan
Hansen's ("Hansen") claims as well as its counterclaim for breach
of contract (Docket Entry No. 32). Also pending is a Motion for
Summary Judgment filed by Defendant MainStreet Homes, LLC
("MainStreet Homes") (Docket Entry No. 35). Those motions have
been fully briefed by the parties. (Docket Entry Nos. 36, 39, 45,
46, 48, 49, 58 & 65). Hansen has filed Objections to MainStreet
Homes' Reply and Response to Plaintiff's Statement of Additional
Facts (Docket Entry Nos. 65 & 66), and seeks leave to file

1

Objections to Liberty Partners' Reply and Response to Plaintiff's Statement of Additional Facts (Docket Entry No. 67).[1]

## I. FACTUAL BACKGROUND

This case involves a dispute relating to the construction of a new home. Although the parties appeared to have reached an agreement regarding the home's construction, Hansen backed out of the deal when she discovered that, contrary to what she claims was the parties' understanding from the inception of negotiations, the house could not be built with only three to four steps to the entrance so it would be accessible to persons in a wheelchair.

After the deal soured, Hansen filed a twice-amended, 193-paragraph complaint alleging violations of the Fair Housing Amendments Act ("FHAA"), 42 U.S.C. § 3601 *et seq.*, and the Tennessee Consumer Protection Act ("TCPA"), 47-18-101 *et seq.*, the common law tort of conversion, and a claim for "Fraudulent Inducement to Contract By Promissory Fraud." (Docket Entry Nos. 5, 7 & 20). Liberty Partners filed a counterclaim for breach of contract. (Docket Entry No. 17). Both Defendants have filed a Motion for Summary Judgment with respect to Hansen's claims and Liberty Partners has filed a Motion for Summary Judgment on its

---

[1]The "Objections" in Docket Entry Nos. 65 & 66 are not properly objections but instead are in the nature of a sur-response. Nevertheless, this Court has considered the same in arriving at the decision on the Motions for Summary Judgment and the objections will be overruled as moot. Plaintiff's request to file Objections to Liberty Partners' Response and Reply to Plaintiff's Statement of Facts (Docket Entry No. 67) will be denied since such a filing is well beyond the scope of Local Rule 8 and the parties have fully briefed the pending Motions for Summary Judgment.

counterclaim.  The facts, construed in Hansen's favor as they must be for summary judgment purposes, are as follows.

**A.  <u>Facts Related to Plaintiff's Claims</u>**

On March 3, 2003, Hansen decided to purchase a home in the Willow Springs subdivision in Franklin, Tennessee and provided Defendants with a deposit check in the amount of $2,000.  (Hansen Depo. at 89).  She later changed her mind and decided to build a home in the Ashton Park subdivision in Franklin, Tennessee and provided Defendants with an additional $3,000 as a deposit.  (<u>Id</u>. at 92; Docket Entry No. 1, Ex. A-1).

Liberty Partners is the developer of homes in both subdivisions.  Liberty Partners contracted with MainStreet homes to serve as the marketing agent for lots in those subdivisions and to perform new home construction in the development.  (Docket Entry No. 17 at 17).

Hansen entered into a "Contract for Sale of Real Estate" on May 25, 2003, for Defendants to construct a Buchanan style dwelling on Lot 145 in Ashton Park.  The agreed purchase price was $334,026.00.  (Hansen Depo. at 127-129; Docket Entry No. 1, Ex. C).  As with her choice of subdivision, Hansen changed her mind with respect to the type of home she desired.  On September 26, 2003, Plaintiff signed a "Contract for Sale of Real Estate" for Defendants to construct a McKinley VI model dwelling on lot 145 in Ashton Park for the purchase price of $431,789.00.  (Hansen Depo. at 129-131 & Docket Entry No. 1, Ex. D).  This house was never built and Plaintiff claims that the reason was because Defendants

3

had misrepresented the feasibility of building a home on lot 145 with no more than four entryway steps.

Hansen claims that, from the very beginning of her discussions with Defendants, she informed them that she needed a house which would be easily accessible to persons in wheelchairs. According to Hansen, that discussion and agreement occurred not just once, but many times. (Hansen Depo. at 173, 189).

Plaintiff's mother suffered from Alzheimer's and was wheelchair bound. At the time Hansen entered into her initial contract to purchase from Defendants, her mother was in a nursing home and needed care twenty-four hours a day, seven days a week. Hansen expected that her mother would come to the house to visit her. (Hansen Depo. at 44-50). Hansen's mother passed away on August 1, 2003. (Hansen Depo. at 18).

Hansen also claims that she informed Defendants she needed a wheelchair accessible house[2] because she had a close friend, Barbara Hudson ("Hudson"), who suffered from ALS (Lou Gehrig's Disease). Hudson had her own home and she was cared for by two nurses, Eva McMurtrie ("McMurtrie") and Connie Davis ("Davis"). Hudson was diagnosed with the disease in August of 2003. Prior to that diagnosis, however, Hudson had been suffering for quite some

_____

[2]By utilizing the phrase "wheelchair accessible," the Court is not suggesting that Hansen evidenced any intention that the home comply with legal requirements under the Americans With Disabilities Act or any other statute or regulation relating to handicap accessibility. Hansen's claim is that a house with only three or four steps would be manageable as far as she was concerned in terms of ingress and egress for a person confined to a wheelchair.

4

time and was progressively becoming weaker. (Hudson Depo. at 63-64, 235). Hansen's information regarding Hudson's condition came from Hudson, as well as her nurses. (Id. at 69).

Hansen claims that she and Hudson discussed the possibility of Hudson and her nurses moving in with Hansen as her disease progressed. A primary concern was Hudson's ability to get in and out of the house while confined to a wheelchair. Hansen claims she told several of Defendants' employees of the possibility that Hudson would be moving in with her and it was for this reason that she decided to build the larger and more expensive McKinley model home. (Hansen Depo. at 63-73, 235). Two of the four bedrooms in the McKinley were on the ground floor. (Hanson Depo. at 244).

Hansen first started looking at homes in Willow Springs at the suggestion of Hudson. She later looked at homes in Ashton Park, also at the suggestion of Hudson. (Id. at 87 & 92). Hudson, Hansen and McMurtrie togther looked at homes in the Ashton Park subdivision and, on at least one of those occasions, Kristin Sitz, an employee of MainStreet Homes, accompanied them. (Id. at 120).

Hansen claims that she chose lot 145 after consultation with Jennifer Wargny ("Wargny") of MainStreet Homes. According to Hansen, she informed Wargny that she wanted the most level and largest lot. Hansen also told Wargny that she wanted no more than three to four steps to the front door because Hudson's health was not that good and because her mother would also be visiting.

Wargny represented that lot 145, a corner lot, would suit Hansen's needs and that a home built on that lot would only require

5

three to four steps up to the front door. (Id. at 100-101). Hansen looked at that lot in person as did Hudson, McMurtrie and Ted Sanders ("Sanders"), Hansen's real estate agent. Hansen believed a home with no more than four steps could be built on the lot. (Id. at 99 & 102).

Hansen claims that just before she upgraded to the McKinley, she had a long conversation with Wargny, as well as with Rebecca Balfour ("Balfour"), the selections coordinator for MainStreet Homes, about the possibility of Hudson moving in with her. Hansen told them the shower in the master bedroom needed to be accessible to Hudson and required that a seat be installed. (Id. at 108-109, 193). Balfour indicated that would be no problem. (Id. at 110).[3]

Hansen also claims she spoke with Wargny and Sitz several other times about wanting no more than four steps and both assured her that would not be a problem (Hansen Depo. at 173-174, 260-261). Neither of them ever indicated that the style of home as between the Buchanan and McKinley would make a difference with regard to the feasibility of having only three or four steps to the front door. (Id. at 175).

In an Affidavit, McMurtrie claims that in September of 2003, she, along with Hansen and Hudson, went to Ashton Park for the purpose of selecting a home in which those three along with another nurse could live. They met with Sitz and had a conversation about

_____

[3]The three also talked about the French door going into the second bedroom and whether that should be changed to a regular door since Hudson would be living in that room. (Id. at 110).

6

housing possibilities.  McMurtrie states that during the discussion, Sitz was informed that they needed a house which would allow for wheelchair access since Hudson was gravely ill with ALS.  Sitz indicated that she understood the wheelchair access requirement and at no point suggested that the requested wheelchair accommodation could not be met.  (Docket Entry No. 51, McMurtrie Aff. ¶¶ 7-10).

Hansen met with the builder, Doug Santee ("Santee")[4] on December 9, 2003 and went over the floor plans.[5]  Page two of those plans depicted the first floor.  The first floor plan indicates that the front entryway would have "steps as needed" from the ground to the porch, as would the side covered porch which connected the main dwelling to the garage at the back of the house. Two steps led from the garage entrance up to a covered porch which was connected to the house.  (Docket Entry No. 53, Attachments).

After Hansen signed off on the drawings, but still on December 9, 2003, she and Santee looked at lot 145 and Hansen saw rocks stacked on the lot.  She claims Santee then told her that lot 145 could not be excavated and that the lot would have to be sloped with the back higher than the front.  (Hansen Depo. at 196, 211-212).  This is the first time that Hansen was told the garage would be higher than the main level of the house and that there would be more than one or two steps from the garage to the house.  (Hansen

_____

[4]According to Hansen, Wargny or Sitz was also at this meeting. (Hansen Depo. at 204).

[5]The floor plans consisted of nine drawings, most of which contain Hansen's signature indicating that she saw those plans. (Hansen Depo. at 199-200).

Depo. at 202-207, 252-53; Docket Entry No. 53, Ex. 2). In fact, Santee told her that the house would require six to twelve steps between the garage and the enclosed porch. (Hansen Depo. at 252-255). Such a configuration would be unlike the model which had only a couple of steps leading from the garage up to the covered porch. (Hansen Depo. at 206). Hansen expected her home to have one or two steps, just like the model. (Hansen Depo. at 198).

Because only a couple of steps was not practical given the elevation of the garage in relation to the house, Santee sketched in several landings, each connected by a couple of steps. (Hansen Depo. at 202-204, 255; Docket Entry No. 53, Ex. 2).[6] Hudson and Santee discussed the possibility of extending the garage by several feet to accommodate landings and steps. (Hansen Depo. at 204).

For the next month or so, Hansen and Santee talked about the step situation. (Hansen Depo. at 211, 256-257). As things turned out, the steps and landings solution was not practical. (Hansen Depo. at 213). Santee looked into the possibility of placing a ramp to the front entrance, changing the elevation of the driveway, and/or the number of steps leading to the courtyard. (Hansen Depo. at 196). Ultimately, Santee told her it was "impossible" to configure the house such that it could be accessible via

_____

[6]Santee's hand-sketched drawing shows "two steps, landing, two steps, landing, two steps." The steps and landing are professionally drawn onto a revised plan dated December 18, 2003. Hansen did not sign the revised plans. (Docket Entry No. 53, Attachments).

8

wheelchair, either through a step and landing configuration or a wheelchair ramp. (Hansen Depo. at 257-258).

Hansen claims that she would have been satisfied with the three to four steps as promised, a wheelchair ramp, or a series of steps and landings.[7] (Hansen Depo. at 195, 264). Nevertheless, Hansen was told it would be impossible to accommodate her request even though she agreed to pay more money for the changes or even eliminate the wraparound porch. (Hansen Depo. at 258-29). Because of that, Hansen told Defendants she no longer wished to purchase the McKinley style home.

Hansen ultimately purchased a house from Turnbury Homes. The house is a four bedroom two-story with the master bedroom downstairs. The home entry is only two-steps up from the ground. (Hansen Depo. at 77 & 83). Hansen moved into the home in March of 2004. (Hansen Depo. at 66). Hudson passed away several months after Hansen purchased her Turnbury Home. Hudson never moved in with Hansen. (Hansen Depo. at 66 & 85).

**B.** **Facts Related to Liberty Partners' Counterclaim**

As indicated, Hansen ultimately selected a McKinley VI model to be built on lot 145 in Ashton Park. Hansen and Liberty Partners entered into a "Contract for Sale of Real Estate" ("contract") with regard to the purchase and construction of that home on September 26, 2003. (Docket Entry No. 17 at 18).

---

[7]The wheelchair ramp or entrance via only a couple of steps would have been solely for Hudson's benefit because at the time she contracted for the McKinley model, Hansen's mother had already passed away. (Hansen Depo. at 259).

Pursuant to the contract, Hansen paid a $5,000 earnest money deposit, together with a construction deposit of $29,000. (Id.).[8] Additionally, Hansen agreed to pay an additional construction deposit in the amount of $10,000 so that, as required by the contract, ten percent of the cost of building the home would be paid. (Id. at 19). On November 18, 2003, Hansen requested a number of changes to the house plans and paid an additional construction deposit of $1,599.60 which represented ten percent of the additional costs for the requested modifications. (Id.).

On December 9, 2003, MainStreet Homes representatives met with Hansen to review her house plans. Purportedly for the reasons previously set forth in this Memorandum, Hansen decided not to go through with the purchase and notified MainStreet Homes of that decision via a letter from her counsel dated February 19, 2004. (Id. at 19).

The contract for the purchase of the house consisted of the following documents in descending order of control: (1) the construction plans; (2) the contract for sale of real estate and addendum; and (3) standard specifications (which were attached to the contract). (Docket Entry No. 1, Ex. D-2). The contract itself had several provisions which are relevant to this dispute.

The contract contained a clause relating to variations between the model home and the home to be built:

_____

[8]These sums were originally paid after Hansen entered into the May 25, 2003 contract to build the Buchanan I model on lot 145. Those sums were transferred and applied towards Hansen's purchase of a McKinley model on that lot. (Id. at 18-19).

10

> [a] Model Homes.  Your new home will be built to the same
> quality standards as our model homes, no better or no
> worse.  However, since a home is a handcrafted product,
> no two are exactly alike.  Light switches and heat vents
> may be in slightly different locations, cabinet lengths
> may vary slightly, room dimensions may vary by an inch or
> two etc.  Also, as time passes, we will make subtle
> improvements to the designs that will affect our current
> building plans.  Our model homes were built to display
> our quality standards, to demonstrate the livability of
> the floor plans, and to show some of the options we
> offer.  You should refer to the specific plans for design
> details.

(<u>Id</u>., Ex. D-2).  Any changes to the home were to be evidenced in writing and signed by the Seller and Buyer.  (<u>Id</u>.).

The contract between Hansen and Defendants contained a change list.  Among other things, a shower seat was to be installed in the right front corner of the shower.  (<u>Id</u>., Ex. D-13, D-14). Additionally, the specification sheet contained an entry stating: "How many steps to front door[?]" (<u>Id</u>., Ex. D-9).

The contract also contained a default clause.  Under that clause, if the Buyer failed to perform the contract, the deposit paid or to be paid was to be retained by the Seller as liquidated damages.  If, however, the Seller refused to perform under the contract, the Buyer was entitled to a return of the earnest money deposit.  (<u>Id</u>. Ex. D-5).  Liberty Partners retained the deposits made by Hansen claiming entitlement to the monies as liquidated damages for breach of contract.  (Docket Entry No. 17 at 19-20).

## II.  <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of

law.  See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).  The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met.  See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986).  The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial.  If the party does not so respond, summary judgment will be entered if appropriate.  Fed. R. Civ. P. 56(e).  The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 325.  A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

12

### III. <u>LEGAL ANALYSIS</u>

As indicated at the outset, Hansen alleges violations of the FHAA and the TCPA. She also claims Defendants fraudulently induced her to enter a contract and that their retention of her deposits constitutes conversion. Even though Defendants seek judgment in their favor, it is quite clear that Hansen sets forth jury questions with respect to each of her claims and Liberty Partners' counterclaim.

### A. <u>Motions for Summary Judgment on Plaintiff's Claims</u>

#### 1. <u>FHAA Act Claim</u>

The Fair Housing Act ("FHA"), passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, *inter alia,* race, gender, and national origin. 42 U.S.C. §§ 3601 *et seq.* The Fair Housing Amendments Act ("FHAA") of 1988 extended coverage to handicapped individuals. 42 U.S.C. § 3604(f). The FHAA "is worded as 'a broad mandate to eliminate discrimination against and equalize housing opportunities for disabled individuals,'" <u>Oconomowoc Residential Programs, Inc. v. Wisc. Coalition for Advocacy</u>, 300 F.3d 775, 7829 7th Cir. 2002)(citation omitted), and makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap[.]" 42 U.S.C. § 3604(f)(3).

In its brief, MainStreet Homes argues in passing that Hansen has failed to show that Defendants discriminated against her on the

13

basis of a handicap and cites for this statement "Hansen['s] deposition generally." (Docket Entry No. 36 at 12). To the extent MainStreet is arguing that there exists no evidence that either Defendant discriminated *on the basis of a handicap*, that claim must be rejected given Hansen's unrefuted testimony as explained below, McMurtries' affidavit, and the lack of any of evidence from the Defendants as to why the house was not built to accommodate a wheelchair occupant, or even whether that was feasible.

Defendants' primary arguments with respect to Hansen's claim under the FHAA is that she lacks standing to bring the claim and that she has failed to establish a "handicap" within the meaning of the Act. This Court disagrees.

### a. Standing Under the FHAA

"[T]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975). "This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise." <u>Id</u>.

"The constitutional limits on standing eliminate claims in which the plaintiff has failed to make out a case or controversy between [her]self and the defendant" and hence a plaintiff must generally show that she has suffered some injury at the hands of the defendant. <u>Gladstone Realtors v. Bellwood</u>, 441 U.S. 91, 99 (1979). However, standing may be expanded by Congress to the full

14

extent permitted by Article III and it did so with respect to claims under the FHAA.  Id. at 101 & 109.

The FHAA makes it unlawful to discriminate in the sale or rental of property because of a handicap of-

(A) that person; or

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.

42 U.S.C. § 3604(f)(2).  Hansen claims a violation of the FHAA because of her association with Hudson.  (Hansen Depo. at 259; Docket Entry No. 5 ¶ 125-130).  According to Hansen's allegations and evidence, she can make a claim under 42 U.S.C. § 3604(f)(2)(B) & (C) because Hudson was an intended occupant of the McKinley home and she and Hudson were "associated."  See Giebeler v. M & B Associates, 349 F.3d 1143, 1158 (9th Cir. 2003)("the FHAA recognizes that nondisabled persons may choose to rent apartments for occupancy by disabled persons and protects these arrangements").

Given the plain language of § 3604(f)(2), Liberty Partners' argument that "Congress did not intend to draft the Fair Housing Act" to apply to "visitors" (Docket Entry No. 55 at 6) is without merit.  Hansen alleges Defendants discriminated against her because Hudson intended to reside in the house with her after it was sold to her.  Hansen states she also made clear to Defendants that Hudson was associated with her.  (See Hansen Depo. at 108-109 & 193).  Moreover, MainStreet Home's argument that "the record is completely devoid of any proof to substantiate that the Plaintiff

15

is associated with Barbara Hudson" or that she was an "intended visitor[] or occupant[] of the dwelling contracted for by the Plaintiff" (Docket Entry No. 58 at 8) is not supported by the evidence before the Court at this point. Hansen repeatedly testified in her deposition as to her association with Hudson, that Hudson had a disability, that Hudson was going to eventually live with her, and that Defendants were made aware of this possibility. Furthermore, according to Hansen's allegations, Liberty Partners and MainStreet Homes' sales agents were given specific instructions about the handicap accommodations that must be made to the building plans.

MainStreet Homes also argues that since Hudson in fact never moved in with Hansen after Hansen purchased her Turnberry home (id.), Hansen cannot establish that Hudson was an intended resident in the McKinley home or was associated with Hansen. However, that after-the-fact event is something the jury, as factfinder, needs to consider in determining whether Hudson was intending to reside with Hansen or was associated with Hansen within the meaning of § 3604(f)(2).

### b. *Handicap Status Under the FHAA*

As is clear from its title, the FHAA is geared towards the protection of handicapped individuals. It defines handicap as (1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). This is substantively identical

16

to the definition of a disability under the Americans With Disabilities Act, 42 U.S.C. § 12012(2). Because of the similarities in language between the two acts, courts often look to and rely on ADA cases in applying the FHAA. See Tsombanidi v. West Haven Fire Dept., 352 F.3d 565, 573 (2d Cir. 2003); Giebeler v. M & B Associates, 343 F.3d 1143, 149 (9th Cir. 2003).[9] Guidance can also be found from cases which discuss the Rehabilitation Act of 1973. See Smith & Lee Associates, Inc. v. City of Taylor, 102 F.3d 781, 795 (6th Cir. 1996).

In this case, Defendants assert that Hansen, having taken no discovery, cannot establish Hudson was handicapped within the meaning of the FHAA. The underlying premise of Defendants' argument is that in order to establish a disability or handicap, expert testimony is necessary. However, this is not always the case. See Head v. Glacier Northwest, Inc., 413 F.3d 1042, 1059 (9th Cir. 2005)(while medical testimony may be helpful to establish whether one cannot perform a major life activity, a plaintiff's testimony alone may establish a genuine issue of material fact on the issue); Clark v. Whirlpool Corp., 109 Fed. Appx. 750, 754 (6th Cir. 2004)(under state statute analogous to ADA, "plaintiff's subjective complaints of disabling pain may be sufficient to prove that she was 'handicapped,' as that term is defined in the statute;

---

[9]Unlike the ADA, the FHAA utilizes the term "disability" instead of "handicap." The change in nomenclature reflects Congress' recognition that the term "handicap" is offensive to some. See Helen D. v. DiDario, 46 F.3d 325, 330 n.8 (3d Cir. 1995).

17

there is no requirement that the plaintiff bolster that testimony with corroborating medical evidence"). In fact, where a disability is readily apparent, the need for expert testimony decreases. <u>Katz v. City Metal Co., Inc.</u>, 87 F.3d 26, 32 (1st Cir. 1996))("[t]here is . . . no general rule that medical testimony is always necessary to establish disability. Some long-term impairments would be obvious to a lay jury (*e.g.,* a missing arm)"); <u>Marinelli v. City of Erie</u>, 216 F.3d 354, 360 (3d Cir. 2000)("the necessity of medical testimony turns on the extent to which the alleged impairment is within the comprehension of a jury that does not possess a command of medical or otherwise scientific knowledge").

The Court recognizes that Hansen would not be testifying about her own condition, but that of Hudson. However, her testimony regarding Hudson's condition is not all that is before the Court because McMurtrie has stated that Hudson had ALS and that she was her live-in caretaker. Moreover, to the extent that Hudson was confined to a wheelchair, a jury could conclude that she was substantially limited in the major life activity of walking.

The fact that Hansen has no expert testimony to support the assertion that Hudson was handicapped is not fatal to her claim under the FHAA. Instead, it is something which the jury will have to consider in determining whether Hansen can establish her claim.

Moreover, like the ADA, the FHAA prohibits discrimination against individuals "regarded as" being handicapped. The analysis here is not that the individual (in this case Hudson) was necessarily handicapped, but instead that the individual was

18

perceived as being handicapped. See <u>Murphy v. United Parcel</u> <u>Servs.</u>, 527 U.S. 516, 521-22, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) ("[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."). Because perceptions involve the state of mind of the defendant, the question is one generally left for the jury to determine. <u>Ross v. Campbell Soup Co.</u>, 237 F.3d 701, 709 (6th Cir. 2001).

Hansen has presented sufficient evidence to create a jury question as to whether Defendants perceived Hudson as handicapped. Hansen testified in her deposition that both she and Hudson met with an agent of Defendants, that Defendants were repeatedly told that Hudson would visit or live with Hansen, and that the home had to be wheelchair accessible. Taken in a light most favorable to Hansen, Defendants recognized Hudson's "handicap" by agreeing to place a seat in the shower and by attempting to devise a landing and step entryway from the garage into the house.

This does not mean, as MainStreet Homes contends, that every builder in the state of Tennessee who places a seat in the shower is liable under the FHAA because the builder is acknowledging that an individual is handicapped. (Docket Entry No. 58 at 6). Instead, it is one of the facts which the jury can consider in this case in its determination of whether Defendants perceived Hudson as handicapped. Similarly, while MainStreet homes contends that it explored the possibility of creating a landing and steps "in an

19

attempt to maintain a happy and satisfied customer," a jury could view this evidence as supporting the contention that Defendants viewed Hudson as handicapped. Considering the evidence now before the Court, there are factual issues which preclude summary judgment on Hansen's claim under the FHAA.

**2. TCPA Claim**

The TCPA was enacted

> to protect consumers and legitimate business enterprises
> from those who engage in unfair or deceptive acts or
> practices in the conduct of any trade or commerce . . .,
> [t]o encourage and promote the development of fair
> consumer practices; [and] . . . [t]o declare and to
> provide for civil legal means for maintaining an ethical
> standard of dealing between persons engaged in business
> and the consuming public to the end that good faith
> dealings between buyers and sellers at all levels of
> commerce be had in this state[.]

Tenn. Code Ann. § 47-19-102. The statute is remedial in nature and hence it "is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." Morris v. Mack's Used Cars, 824 S.W.2d 538, 540 (Tenn. 1992). Purchasers of real property and homes are covered by the Act, at least to the extent the sale is made by one generally engaged in the sale of real property. Ganzevoort v. Russell, 949 S.W.2d 293, 297-98 (Tenn. 1997).

Defendant Liberty Partners argues that Hansen's TCPA claim is time-barred by the Act's one-year statute of limitations. Tenn. Code Ann. § 47-18-101. It asserts that Hansen signed a contract on May 23, 2003, and hence her Complaint, which was filed on December 9, 2004, is too late.

20

Even though Hansen signed a contract on May 23, 2003, that contract was superseded by the contract signed on September 26, 2003. Moreover, one of the most important parts of that contract, by virtue of the terms of the contract itself, is the construction plans, which Hansen did not see and sign until December 9, 2003. At that time, according to her, she first became aware that the steps into the house would number more than four and the parties sought a solution to that problem. It was not finally determined until early in 2004 that the house could not be built with only four steps, with landings and steps, or with ramps for wheelchair access. Accordingly, her TCPA claim was timely filed.

As substantive grounds for dismissal of the TCPA claim, Defendants assert that there is "no competent proof" before the court to establish a TCPA violation (Docket Entry No. 36 at 14) and that the most Hansen has is "hearsay evidence to support her claim" (Docket Entry 39 at 9). Defendants' essential argument is that Hansen cannot present a jury question as to any wrongdoing under the TCPA.

The TCPA "lists thirty-six acts or practices which are prohibited because they are deemed to be unfair or deceptive." Glanton v. Bob Parks Realty, 2005 WL 1021559 *5 (Tenn. Ct. App. 2005) (citing Tenn. Code Ann. § 47-18-104(b)). Thirty-five of the acts or practices are specific while one is a "catch-all" which prohibits "engaging in any other act or practice which is deceptive to the consumer or to any other person." Id. & Tenn. Code Ann. § 47-18-104(b)(27).

21

In this case, Hansen asserts violations of several provisions of the TCPA, including the "catch-all" provision. The thrust of her complaints in this regard is that (1) Defendants deceitfully represented lot 145 would accommodate a dwelling with no more than four steps from grade to the main living area, (2) the defendants violated their own policy by not providing her copies of the construction plan prior to signing; (3) the model misrepresented the actual nature of the house which would be built; (4) Hansen was not made aware that the plans did not accurately depict the number of stairs which would be necessary until after she signed the same; and (5) defendants took her money knowing that it could not build a house with only four or less steps to the main living area. (Docket Entry No. 5 ¶¶ 139-165).

Contrary to Defendants' contention, Hansen's own deposition testimony is evidentiary support for her allegations that the statute was violated. Whether her allegations are true, of course, is for the jury to determine at trial and not this Court on a summary judgment record.[10] The Court concludes Plaintiff has raised a genuine issue of material fact concerning the alleged violations of the TCPA and it will be for the jury to weigh her testimony in light of the contract which was signed by the parties and any

---

[10]The fact that Hansen admitted in her deposition that she had no *documentary* evidence to support her claims under the TCPA does not make her deposition testimony "hearsay evidence" as Liberty Partners contends (Docket Entry No. 39 at 9). The contract for sale, construction plans, and Liberty Partners' construction policy are documentary evidence which may be considered, along with Hansen's own testimony.

22

evidence the Defendants may wish to present as to what was said or not said about the house having no more than four steps to accommodate her disabled friend.

### 3. __Claim for Conversion__

Defendants assert that Hansen has no claim for conversion because she voluntarily paid over the monies as deposits for the construction of a house on lot 145. (Docket Entry Nos. 36 at 16 & 39 at 12). Additionally, Liberty Partners asserts that Hansen cannot bring a conversion claim because of the "economic loss rule." (Docket Entry No. 39 at 12).

"[U]nder Tennessee law, '[a] conversion, in the sense of the law of trover is the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's rights.'" <u>Kinnard v. Shoney's Inc.</u>, 100 F. Supp.2d 781, 798 (M.D. Tenn. 2000)(citation omitted). "Conversion is an intentional tort, and a party seeking to make out a prima facie case of conversion must prove: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights." <u>State ex el. Flowers v. Tennessee Coordinated Care</u>, 2005 WL 427990, at *7 (Tenn. Ct. App. 2005).

In this case, Hansen, through her own testimony, has created factual questions, resolvable only by the jury, as to whether the Defendants committed the tort of conversion. The essence of her claim is that the Defendants duped her into paying monies for a home which it knew could not be built. Defendants then kept those

23

monies. Viewed in such a light, a jury could conclude, contrary to Liberty Partners' contention, that the money was not used "exactly as intended by the owner" (Docket Entry No. 39 at 12) since it was Hansen's intension that the house be built with fewer than four entryway steps.

The "economic loss rule" does not preclude Hansen's claim for conversion under the facts and circumstances of this case. "The economic loss rule is a judicially created principle that requires parties to live by their contracts rather than to pursue tort actions for purely economic losses arising out of the contract." McLean v. Bourget's Bike Works, Inc., 2005 WL 2493479 at *5 (Tenn. Ct. App. 2005). As "adopted by the Tennessee courts," the economic loss doctrine "prohibits purchasers of products from recovering purely economic damages under negligence or products liability theories." Americoach Tours, Inc. v. Detroit Diesel Corp., 2005 WL 2335369 at *2 (W.D. Tenn. 2005) (citing Ritter v. Custom Chemicides, Inc., 912 S.W.2d 128, 133 (Tenn. 1995)). "The rationale for the economic loss doctrine is that, in the absence of personal injuries or property damage, a defective product has simply 'not performed as expected' and 'the buyer's remedy should be governed by the rules of contract, which traditionally protect expectation interests.'" Id. (quoting Ritter, 912 S.W.2d at 133).

Liberty Partners has cited no authority for the proposition that Tennessee courts would bar a claim for conversion under the economic loss rule, and the Court has found none. Other courts presented with the issue have not reached an accord, although many

24

have concluded that intentional torts, including claims for conversion, are not barred by the economic loss rule. <u>See Indemnity Ins. Co. of North America v. American Aviation Inc.</u>, 891 So.2d 532, 543 n.3 (Fla. 2004)("Intentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent generally remain viable either in the products liability context or if the parties are in privity of contract"); <u>Kish v. Health Personnel Options Corp.</u>, 1999 WL 261421 at *4 (Wis. Ct. App. 1999(extension of economic loss doctrine to conversion not warranted where there was no defective product or service involved and where dispute "does not concern the protection of a commercial party's freedom to allocate economic risk") <u>Berger & Montaque, P.C. v. Scott & Scott, LLC</u>, 153 F. Supp.2d 750, 753 (E.D. Pa. 2001); (under Pennsylvania law, economic loss doctrine does not bar proceeding on both a breach of contract and conversion claim); <u>S.A.I., Inc. v. General Elec. Railcar Serv. Corp.</u>, 935 F. Supp. 1150, 1155 (D. Kan. 1996)(where contract was not for services, conversion claim not barred by economic loss doctrine under Illinois law).

This Court need not hazard a guess as to how Tennessee courts would rule on this issue. This is because Hansen's conversion claim is not limited solely to the economic loss she could recover under the Contract for Sale of Real Estate. Instead, she claims that Defendants' act in converting her deposit not only resulted in the loss of those deposits, but also caused her to suffer severe emotional stress, exacerbated her physical condition, led to her

25

having to spend money to rent a dwelling, and caused her to lose equity in her home because of its premature sale. (Docket Entry No. 5 ¶ 169).

The Court recognizes that Defendants take issue with such things as whether or not Hansen actually lost money in having to rent another dwelling, lost any equity in her home, or suffered severe emotional distress. However, these are factual questions to be presented to the jury and whether Hansen can prove her alleged consequential damages (or any damages for that matter) remains to be seen. The point is that while damages for conversion are generally measured by the sum necessary to compensate a plaintiff for actual losses, with proper proof, Tennessee law allows for the recovery of special and consequential damages, including mental anguish. <u>See</u> <u>Caldwell v. Canada Trace, Inc.</u>, 2004 WL 1459418 at *7-8 (Tenn. Ct. App. 2004); <u>Lance Productions v. Commerce Union Bank</u>, 746 S.W.2d 207, 213 (Tenn. Ct. App. 1988).

Since the economic loss doctrine applies to pure economic losses, the Court finds it inapplicable to Hansen's claim for conversion in this case. Accordingly, summary judgment on this claim will not be granted.

### 4. <u>Fraudulent Inducement Claim</u>

Defendants have moved for summary judgment on Hansen's fraudulent inducement to contract claim[11] on the grounds that

---

[11]Although the Defendants have both moved for summary judgment on all of Hansen's claims, Liberty Partners does not directly address Hansen's fraudulent inducement to contract claim in its brief in support of its Motion for Summary Judgment. The Court

26

"Plaintiff fails to offer any proof, nor can any be presented, establishing that the defendant[s] fraudulently induced the plaintiff to contract by promissory fraud[.]" (Docket Entry No. 36 at 15). It is further asserted that "the contracts speak for themselves" and that "plaintiff's factual allegations in this case are nothing more than a violation of the parol evidence rule regarding the contracts at issue," id., although no authority is provided for that proposition.

"The five elements of an action for fraudulent inducement to contract are: (1) a false statement concerning a fact material to the transaction; (2) knowledge of the statement's falsity or utter disregard for its truth; (3) intent to induce reliance on the statement; (4) reliance under circumstances manifesting a reasonable right to rely on the statement; and (5) an injury resulting from the reliance." Lamb v. Megaflight, Inc., 26 S.W.2d 627, 630 (Tenn. Ct. App. 2000). Under Tennessee law, the general rule is that "summary judgment is not appropriate for a fraud claim because a trial is needed to develop the action fully." Flite ex rel. H & M Const. Co. v. Flite, 1999 WL 317102 at *7 (Tenn. Ct. App. 1999) (citing Fowler v. Happy Goodman Family, 575 S.W.2d 496, 499 (Tenn. 1978)).

Hansen has presented sufficient evidence to present a jury question on whether Defendants fraudulently induced her to enter into a contract to purchase a McKinley home for lot 145. In her

---

therefore addresses the arguments raised by MainStreet Homes with respect to this claim.

deposition she testified that she was told lot 145 was sufficiently level to support a home with only three to four steps.  Such representations came from those who were in the business of building homes.  That representation continued to be made and based upon it she decided to build a home on the lot to her detriment by paying various deposits.  Hansen alleges that the late revelation by Liberty Partners that it would be "impossible" to build such a home on this particular lot indicates that the continuing representations by the Defendants about the feasibility of building such a home as requested and promised were false when made, or, at a minimum, with reckless disregard for the truth.  The veracity of any of these allegations is not for the Court to decide.  Instead, it is a question for the jury.

MainStreet Homes' contention that the parol evidence rule bars Hansen's testimony as it relates to her fraudulent inducement claim must be rejected.  The Tennessee Court of Appeals has indicated "neither the parol evidence rule nor the statute of frauds prevents the use of parol evidence to prove a fraudulent inducement to enter into a contract claim." Loew v. Gulf Coast Dev., Inc., 1991 WL 220576 at * 6 (Tenn. Ct. App. 1991).  Shortly after the decision in Loew, a different panel of that court indicated "that it is permissible to use parol evidence to avoid liability on a contract on the ground of fraudulent inducement, but only if the subject matter of the parol evidence either is not addressed in, or does not contradict the express terms of the signed writing." United Nat'l Real Estate, Inc. v. Thompson, 1992 WL 69642 at *7 (Tenn. Ct.

28

App. 1992).  Even under the more stringent approach espoused in
Thompson, Hansen's testimony would not be barred by the parol
evidence rule because, as will be seen in the discussion relating
to Liberty Partners' counterclaim for breach of contract, Hansen's
testimony regarding the number of steps up to the home does not
contradict the express terms of the signed contract for sale of
real estate.  Accordingly, Defendants are not entitled to summary
judgment on Hansen's claim for fraudulent inducement to contract.

    **5.**  **Claims for Declaratory and Injunctive Relief**

    MainStreet Homes seeks dismissal of Hansen's claims for
declaratory and injunctive relief on the grounds that such requests
are moot because she purchased an alternate home.  For that
proposition, MainStreet Homes relies exclusively on Arizonian's for
Official English v. Arizona, 520 U.S. 43 (1997).  That case,
however, is inapposite.

    Arizonian's for Official English involved an Arizona state
constitutional amendment requiring that governmental employees
conduct their official duties in English, as opposed to any other
language.  Suit was brought by a state employee who alleged the
requirement violated the United States Constitution.  However,
after prevailing in the district court, the employee left
government service and an association entered the case to defend
the judgment on appeal.  The Supreme Court held the unilateral
action of the plaintiff in leaving government service "mooted the
case stated in her complaint."  Id. at 72.

29

In this case, Hansen's purchase of a different house does not moot her claim for declaratory and injunctive relief as stated in her complaint. Hansen seeks a declaration that the actions of Defendants violated the FHAA, the TCPA, and Tennessee common law. She also seeks injunctive relief which would prohibit Defendants from engaging in the sort of conduct alleged in this case and from discriminating against individuals in violation of the FHAA. (Docket Entry No. 5 at 25-26). Since her case has not yet been adjudicated, the controversy is very much alive. Moreover, Defendants have not established "the heavy burden of persuad[ing] the court" that Hansen's purchase of another house "made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 203 (1968). The motion for summary judgment with respect to Hansen's claim for injunctive and declaratory relief will be denied.

**B.** **Motion for Summary Judgment On Liberty Partners' Counterclaim**

Liberty Partners asserts it is entitled to summary judgment on its counterclaim for breach of contract. Its argument in this regard is that the Contract for Sale of Real Estate was an enforceable contract under the terms of which Liberty Partners was entitled to keep the deposits made by Hansen if she defaulted on the contract. Liberty Partners' position, of course, presupposes that it complied with all its obligations under the contract, the contract was unambiguous as written, and Hansen first breached the contract.

30

"The cardinal rule for the interpretation of a contract is to ascertain the intention of the parties and to give effect to that intention consistent with legal principles." Citadel Investments, Inc. v. White Fox Inc., 2005 WL 1183084 at *5 (Tenn. Ct. App. 2005). "If the language of a written contract is clear and unambiguous, a court must interpret the contract as written." Id.

However, the rule of literal construction does not apply where a contract's provision is ambiguous, that is where "it is of uncertain meaning and may fairly be understood in more ways than one." Empress Health & Beauty Spa, Inc. v. Turner, 503 S.W.2d 188, 190 (Tenn. 1973). In such situations, "parol evidence is admissible to explain the actual agreement." Jones v. Brooks, 696 S.W.2d 885, 886 (Tenn. 1985); Birdwell v. Psimer, 151 S.W.2d 916, 920 (Tenn. Ct. App. 2004).

In this case, the Contract for Sale of Real Estate evidences the parties' intention to have a McKinley style home built on lot 145 for the price of $431,789.00. However, how that home was to be constructed and configured in terms of access from grade level is not precisely spelled out in the contract documents. In the Court's view, the sale and construction documents are ambiguous and do not clarify the critical issue raised in this lawsuit, i.e. the wheelchair accessibility of the entrance.

The contract for the purchase of the house consisted of the contract for sale, the construction plans, and standard specifications. The contract itself suggests that the home Hansen was to purchase was to be similar to the model McKinley home, but

31

not exactly. There could be slight variations because "no two are exactly alike" and such things as the location of light switches, heat vents, cabinet length, room dimensions, and the like may vary slightly.

With regard to the number of steps required to enter the front entryway, the specification contains the notation "How many steps to front door[?]" This, of course is uncertain and ambiguous. The construction plans also indicate that there would be "steps as needed." The only evidence before this Court relating to the number of steps in the model home is Hansen's testimony that it contained only one or two steps. Based upon the contract documents, there is ambiguity regarding the actual elevation of the house.

Moreover, under the contract, the model was supposed "to demonstrate the livability of the floor plans." Hansen's testimony, which is undisputed by the proof, is that the home being constructed for her by Liberty Homes contained anywhere from eight to twelve steps and had a garage which was higher than the house. This presents a question as to whether such a home would in fact have the same "livability" as the model home which had only one or two steps leading from the garage up into the house.

Because ambiguity exists even after the Court analyzes the contract under standard construction principles, the legal meaning of the contract becomes a question of fact. <u>Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.</u>, 78 S.W.3d 885, 890 (Tenn. 2002). As such, summary judgment is not appropriate. Instead, it

Case 3:04-cv-01099   Document 72   Filed 12/22/05   Page 32 of 33 PageID #: 1141

will be for the jury to consider various matters including "the negotiations leading up to the contract, the course of conduct the parties followed as they performed the contract, and any utterances of the parties that might shed light upon their intentions." Stephenson v. The Third Co., 2004 WL 383317 at *4 (Tenn. Ct. App. 2004)(collecting cases).

## IV.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment filed by Defendant Liberty Partners, LLC as to Plaintiff's claims and as to its counterclaim (Docket Entry No. 32) will be denied. The Motion for Summary Judgment filed by Defendant MainStreet Homes, LLC (Docket Entry No. 35) will also be denied. Plaintiff's Objections to MainStreet Homes' Reply (Docket Entry No. 65) and her Objections to MainStreet Homes Responses' to Plaintiff's Statement of Material Facts (Docket Entry No. 66) will be overruled. Plaintiff's Motion for Leave to File Objections to Liberty Partners' Reply and Response to Plaintiff's Statement of Additional Facts (Docket Entry No. 67) will be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE